UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JAMES FOOTMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:21-cv-00277-JAW |
| | ) | |
| LIBERTY INSURANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On November 25, 2017, while hunting in the town of Oxford, Maine, Zachary Mills shot James Footman, causing personal injuries. After Mr. Footman sued Mr. Mills in state court, an arbitration award of $1,436,330.76 was reduced to judgment against Mr. Mills. Liberty Insurance Corporation (Liberty) insured Mr. Mills' mother and grandparents through homeowner's insurance policies issued on their residences. Liberty declined to defend Mr. Mills and rejected claims for indemnification under the policies on the ground that Mr. Mills was not a resident of either home. Mr. Mills assigned all rights against Liberty to Mr. Footman, and, by virtue of the assignment, Mr. Footman sued Liberty to establish coverage under the homeowners' policies and to recover defense costs. After reviewing dueling motions for summary judgment, the Court concludes that Mr. Mills was not a resident of either home on November 25, 2017 and therefore grants judgment against Mr. Footman and in favor of Liberty.

## I.     PROCEDURAL HISTORY

On August 31, 2021, James Footman filed a complaint against Liberty in Oxford County Superior Court, alleging that it had improperly refused to provide insurance coverage for the November 25, 2017 hunting accident. *Def. Notice of Removal* (ECF No. 1), Attach. 2, *Compl.*[1]   On September 28, 2021, Liberty removed this case to federal court, *Removal Order* (ECF No. 3), and on January 21, 2022, it answered the Amended Complaint.   *Def.'s. Answer to Amended Complaint and Demand for Jury Trial* (ECF No. 16) (*Def.'s Answer*).   The Amended Complaint contains nine counts: Count I—breach of contract; Count II—unfair deceptive acts or practices;  Count III—quantum meruit;  Count IV—strict liability;  Count V—negligence; Count VI—declaratory judgment; Count VII—unfair claims settlement; Count VIII reach and apply; and Count IX—punitive damages. *Am. Compl.* at 4-8.

On April 12, 2022, Liberty filed a motion for summary judgment, *Def.'s Mot. for Summ. J.* (ECF No. 19) (*Def.'s Mot.*), with a statement of facts.  *Def.'s Statement of Material Facts* (ECF No. 20) (DSMF).   On May 3, 2022, Mr. Footman filed a response to Liberty's statement of facts, *Resp. to Def.'s Statement of Material Facts* (ECF No. 26) (PRDSMF), and opposed Liberty's motion for summary judgment.  *Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 27) (*Pl.'s Opp'n*).   On May 16, 2022, Liberty replied.   *Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 28) (*Def.'s Reply*).

---

[1]     Mr. Footman initially identified Liberty Mutual Group, Inc. as the Defendant. *Id.* After Defendant answered that Plaintiff had misnamed it, Mr. Footman filed an amended complaint naming Liberty Insurance Corp. as Defendant. *Pl's Mot. For Leave to Amend Compl.* at 1 (ECF No. 13); *Am Compl.* (ECF No. 15).

On April 12, 2022, Mr. Footman filed a cross-motion for partial summary judgment, *Pl.'s Mot. for Summ. J.* (ECF No. 21) (*Pl.'s Mot.*), along with his own statement of material facts. *Pl.'s Statement of Material Facts* (ECF No. 22) (PSMF). On May 2, 2022, Liberty responded to Mr. Footman's motion for partial summary judgment, *Def's Opp'n to Pl.'s Mot. for Summ. J.* (ECF No. 24) (*Def.'s Opp'n*), and filed a response to Mr. Footman's statement of material facts. *Def.'s Resp. to Pl.'s Statement of Material Facts* (ECF No. 25) (DRPSMF). Mr. Footman replied on May 17, 2022. *Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Summ. J.* (ECF No. 29) (*Pl.'s Reply*).

## II.    THE SUMMARY JUDGMENT FACTS[2],[3]

### A.    The Hunting Accident and Liberty's Insurance Policies

On November 25, 2017, James Footman and Zachary Mills were hunting on property near 302 Number Six Road, Oxford, Maine, the home of Mr. Mills' girlfriend

---

[2]     Where, as here, the parties file cross-motions for summary judgment, the Court must evaluate each motion independently and "determine 'whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). For cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of New Hampshire v. Gardner*, 759 F. Supp. 2d 215, 212 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011). Thus, in accordance with "the conventional summary judgment praxis," with regard to the Plaintiff's motion for summary judgment and its supporting facts, the Court recounts the facts in the light most hospitable to Liberty's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In compliance with that obligation, the Court recites supported facts as true even if Mr. Footman disputes them. *Id.* Likewise, with Liberty's cross-motion for summary judgment and supporting facts, the Court recounts the facts in the light most hospitable to Mr. Footman's case theories consistent with record support and recites supported facts as true even if Liberty disputes them. *Id.*

[3]     Liberty's DSAMF consists nearly entirely of facts already asserted in its DSMF. *Compare, e.g.*, DSMF ¶ 30 ("Since summer 2013, Ms. Whittemore has not provided Mills any regular financial support, although he was on her health insurance plan, and Mills is not and has not been financially dependent on Ms. Whittemore") *with* DSMF ¶ 54 (exact same wording). To avoid redundancy, where Liberty asserts the same fact twice the Court will consider the DSMF version and omit the DSAMF version.

Bailey Bolduc (the Bolduc Residence).  DSMF ¶¶ 6, 10; PRDSMF ¶¶ 6, 10.  Thinking he saw a deer, Mr. Mills fired his weapon and accidentally hit Mr. Footman, who sustained injuries to both forearms.  DSMF ¶¶ 1, 7; PRDSMF ¶¶ 1, 7; PSMF ¶ 1; DRPSMF ¶ 1.

At the time of the incident, Mr. Mills' mother, Jennifer Whittemore, had a homeowners insurance policy with Liberty (the Whittemore Policy) for her residence at 253 Damon Road in Sumner, Maine (the Whittemore Residence).  PSMF ¶¶ 5-6; DRPSMF ¶¶ 5-6; DSMF ¶¶ 3, 24; PRDSMF ¶¶ 3, 24.  At this same time, Mr. Mills' grandparents, Kathy and Charles Mason, also held a Liberty homeowner's insurance policy (the Mason Policy) for their home at 16 Eddies Road in Greenwood, Maine (the Mason Residence).  PSMF ¶¶ 7, 9; DRPSMF ¶¶ 7, 9; DSMF ¶¶ 4, 31; PRDSMF ¶¶ 4, 31.  Liberty is duly licensed to transact insurance business in the state of Maine. DSMF ¶ 2; PRDSMF ¶ 2.

The Whittemore and Mason Policies (collectively, the Policies) are identical, as relevant to this action. DSMF ¶ 5; PRDSMF ¶ 5.  The "Definitions" sections of the Policies included the following:

> In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. . . .
>
> 3. "Insured" means you and residents of your household who are:
>     a. Your relatives; or
>     b. Other persons under the age of 21 and in the care of any person named above.
>
> Under Section II [Liability Coverages], "insured" also means:
> c. With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person

included in 3.a. or 3.b. above. A person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner is not an "insured";

d. With respect to any vehicle to which this policy applies:

(1) Persons while engaged in your employ or that of any person included in 3.a. or 3.b. above; or

(2) Other persons using the vehicle on an "insured location" with your consent.

4. "Insured location" means:

a. The "residence premises";

b. The part of other premises, other structures and grounds used by you as a residence and:

(1) Which is shown in the Declarations; or

(2) Which is acquired by you during the policy period for your use as a residence;

c. Any premises used by you in connection with a premises in 4.a. and 4.b. above;

d. Any part of a premises:

(1) Not owned by an "insured"; and

(2) Where an "insured" is temporarily residing;

DSMF ¶ 5; PRDSMF ¶ 5 (Sections 4(e-h) omitted).[4] The "Personal Liability" sections of the Policies stated that:

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

---

[4]      Mr. Footman qualifies DSMF ¶ 5 to submit that Liberty's cited excerpt excludes important language about the definition of "insured location." PRDSMF ¶ 5. The Court accepts the qualification, supplying the language Mr. Footman requested. *See* DSMF, Attach. 3, *Whittemore Policy* at 17.

DSMF ¶ 5; PRDSMF ¶ 5.

On November 25, 2017, when the hunting accident occurred, Mr. Mills was twenty-one years old.  DSMF ¶ 11; PRDSMF ¶ 11; PSMF ¶ 2; DRPSMF ¶ 2.  He was not a "named insured" on either the Whittemore or the Mason Policy.  DSMF ¶¶ 3-4; PRDSMF ¶¶ 3-4.

## B.   Liberty's Investigation and James Footman's Suit Against Zachary Mills

Ms. Whittemore reported the incident to Liberty on July 30, 2018.[5]  DSMF ¶ 8; PRDSMF ¶ 8.  Liberty set up claim files for both policies, commenced an investigation, and interviewed Mr. Mills.  PSMF ¶¶ 11-12; DRPSMF ¶¶ 11-12; DSMF ¶¶ 9-10; PRDSMF ¶¶ 9-10.  It ultimately decided to deny coverage because, in its view, Mr. Mills did not reside at the Whittemore Residence and therefore did not qualify as an "insured."[6]  PSMF ¶ 13; DRPSMF ¶ 13; DSMF ¶ 12; PRDSMF ¶ 12.  Liberty also denied coverage under the Mason Policy on the same basis.  PSMF ¶ 14; DRPSMF ¶ 14; DSMF ¶ 45; PRDSMF ¶ 45.

On July 17, 2019, Mr. Footman filed a civil action against Mr. Mills in Oxford Superior Court, alleging that Mr. Mills' negligence caused the incident and his injuries.[7]  DSMF ¶ 13; PRDSMF ¶ 13; PSMF ¶ 3; DRPSMF ¶ 3.  The complaint listed

---

[5]     Mr. Footman denies DSMF ¶ 8, contending that the notes for that date do not provide details regarding the claim.  PRDSMF ¶ 8.  The Court observes that the next entry, two days later, describes the hunting incident and bodily injury claim.  *See* DSMF, Attach. 5, *Running Notes* at 7.  The Court accordingly omits Liberty's proposed assertion that Ms. Whittemore's report did not reference Mr. Footman's bodily injury claim.

[6]     Mr. Footman denies DSMF ¶ 12, noting that the cited exhibit does not reference any letter dated November 15, 2018.  PRDSMF ¶ 12.  The Court agrees and omits the reference to that letter.

[7]     Mr. Footman asserts that the complaint was filed on December 20, 2019.  PSMF ¶ 3.  The record reveals that it instead was filed on July 17, 2019.  *See* DSMF ¶ 13; PSMF, Attach. 2, *Compl.* at 4 (*Underlying Compl.*).

Mr. Mills' current address as the Whittemore Residence, although Mr. Footman contends that Mr. Mills was living at the Mason Residence at the time of the incident.[8]  PSMF ¶¶ 4, 8; DRPSMF ¶¶ 4, 8.  It did not identify any familial relationship between Mr. Mills and Ms. Whittemore or the Masons.  DSAMF ¶¶ 45-46.

Liberty did not engage an attorney to defend Mr. Mills in the state civil action or provide coverage under a reservation of rights.  PSMF ¶¶ 15-16; DRPSMF ¶ 15-16.  Mr. Mills hired an attorney to represent him, while Liberty engaged an attorney to represent its own interests with regards to the claims.[9]  PSMF ¶¶ 17-18; DRPSMF ¶¶ 17-18; DSMF ¶ 14; PRDSMF ¶ 14.  On March 31 or April 1, 2020, Mr. Mills' attorney contacted Liberty to request policy language and Liberty responded by providing the policy language and reiterating its position that coverage was unlikely to apply because Mr. Mills was not a resident of Ms. Whittemore's house at the time of the incident.  DSMF ¶ 15; PRDSMF ¶ 15.  Mr. Mills' counsel forwarded this email to Mr. Footman's counsel.  *Id.*

---

[8]   Liberty denies PSMF ¶ 8.  DRPSMF ¶ 8.  The Court will further explore Mr. Mills' residency, but for now modifies PSMF ¶ 8 to reflect that the assertion is Mr. Footman's contention rather than undisputed fact.

[9]   Liberty qualifies PSMF ¶ 17 to object to the contention that Mr. Mills "had to hire an attorney." DRPSMF ¶ 17.  The Court accepts the qualification and slightly alters PSMF ¶ 17.

   Liberty also qualifies most of Mr. Footman's claims regarding its conduct during the underlying action, admitting the factual assertions but arguing that they are not material to Mr. Footman's claims.  *See* DRPSMF ¶¶ 17-21, 23-26.  Because Mr. Footman alleges that Mr. Mills was insured by Liberty, these assertions are at least plausibly relevant to his claims that Liberty improperly refused to defend Mr. Mills and meddled in the litigation, and although the Court rejects Liberty's relevance objections, the Court agrees with Liberty that the main point in these motions is where Mr. Mills resided as of November 25, 2017.

On January 13, 2021, Mr. Mills' attorney contacted Liberty to notify it that an arbitration was scheduled for later that month, and, in an ensuing email exchange, Mr. Mills' attorney informed Liberty that Mr. Mills was seeking coverage under both the Whittemore and Mason Policies.  DSMF ¶¶ 16-17; PRDSMF ¶¶ 16-17.  The parties dispute whether this was Liberty's first notice of the underlying action.[10] DSMF ¶¶ 18-19; PRDSMF ¶¶ 18-19.  On January 21, 2021, Liberty was provided with a copy of the complaint in the underlying action.  DSMF ¶ 20; PRDSMF ¶ 20. Mr. Footman also provided Liberty with documents listing Mr. Mills' address as either the Mason or the Whittemore Residence.  DSMF ¶ 43; PRDSMF ¶ 43; PSMF ¶ 22; DRPSMF ¶ 22.  Liberty conducted additional investigation—including recorded interviews of Ms. Mason and Ms. Whittemore—and again denied coverage under both policies after "determin[ing] that Mills did not qualify as an 'insured' under the Policies because he was not a resident of the Whittemore household or the Mason household on the date of the incident."[11]  DSMF ¶¶ 21-23, 45-46; PRDSMF ¶¶ 21-23, 45-46.  Liberty did not file for a declaratory judgment to determine whether it should provide a defense and/or indemnity coverage.  PSMF ¶¶ 19-20; DRPSMF ¶¶ 19-20.

---

[10]   Mr. Footman denies DSMF ¶¶ 17-18, submitting emails from Mr. Mills' attorney contending that he had previously informed Liberty of the suit.  PRDSMF ¶¶ 17-18; PSMF, Attach. 12, *Emails Between Jeffrey Wilson and Michael Schlegel* at 6-7.  The Court alters DSMF ¶¶ 17-18 to reflect that this issue is disputed and will—to the extent relevant—resolve it against the nonmoving party.

[11]   Mr. Footman qualifies DSMF ¶ 22 to object that there is no recording of Ms. Mason's interview, PRDSMF ¶ 22, and denies DSMF ¶ 23 because the cited exhibit "does not indicate Liberty obtained a recorded interview of Ms. Whittemore."  PRDSMF ¶ 23.  The Court finds references to both interviews in the cited exhibit and rejects Mr. Footman's qualification and denial.  *See* DSMF, Attach. 14, *RFP Response* at 10, 15 ("Transcript of recorded interview of Jennifer Whittemore" and "Transcript of recorded interview of K. Mason").

Liberty was offered an opportunity to participate in the arbitration hearing for the underlying action but declined.  PSMF ¶¶ 21, 23-24; DRPSMF ¶¶ 21, 23-24; DSMF ¶ 47; PRDSMF ¶ 47.  Prior to the hearing, Liberty's then-counsel contacted the arbitrator by phone, without informing Mr. Footman's or Mr. Mills' attorneys, but nothing was decided by the arbitrator during the call.  DSMF ¶ 48; PRDSMF ¶ 48; PSMF ¶¶ 25-26; DRPSMF ¶¶ 25-26.  In discovery for the instant action, Liberty's attorney initially denied that this call took place.  PSMF ¶¶ 35, 40; DRPSMF ¶¶ 35, 40.  The hearing was originally scheduled for January 5, 2021 but, after Liberty requested a continuance to conduct further investigation, the hearing was rescheduled to April 26, 2021.[12]  PSMF ¶¶ 27-28; DRPSMF ¶¶ 27-28.  Liberty knew Mr. Mills' residency was going to be an issue addressed in the arbitration hearing.[13],[14]  PSMF ¶ 41; DRPSMF ¶ 41.

The hearing was held on April 26, 2021 and, after the parties stipulated that Mr. Mills' negligence was the direct cause of Mr. Footman's injuries, the arbitrator awarded Mr. Footman a judgment against Mr. Mills for $1,436,330.76, plus interest

---

[12]    Liberty objects that Mr. Footman has not "establish[ed] this contention" between Liberty and the continuance.  DRPSMF ¶ 28.  The Court rejects this qualification as contradicted by the record. *See* PSMF, Attach. 10, *Pl.'s Unopposed Mot. to Rescind Order and to Extend ADR Deadlines* (offering as the sole reason for the requested continuance that Liberty indicated "they need more time to investigate . . . and asked that the arbitration be continued for 60 days").

[13]    Liberty denies PSMF ¶ 41.  DRPSMF ¶ 41.  However, the first sentence of the cited email, discussing the upcoming arbitration hearing, states "[r]esidency of Zach [Mills] is an issue."  PSMF, Attach. 18, *Email from Ted Dilworth to Michael Schlegel*.  The Court overrules the objection and admits PSMF ¶ 41 .

[14]    Liberty denies PSMF ¶ 39, contending that the cited exhibit does not establish the asserted allegations that it was "well aware and concerned the arbitration hearing could operate to prejudicially and directly affect its property . . . ."  DRPSMF ¶ 39.  The Court agrees, observing that the cited email only indicates that Liberty's counsel suggested to that arbitrator that he should not decide the issue of Mr. Mills' residence without Liberty present.  *See* PSMF, Attach. 3, *Email from Chris Dinan re: Footman v. Mills Arbitration*.  The Court sustains the objection and omits PSMF ¶ 39.

and costs, which was accepted and entered by the Superior Court.  PSMF ¶¶ 29-30; DRPSMF ¶¶ 29-30; DSMF ¶¶ 49, 51; PRDSMF ¶¶ 49, 51.  Liberty refused to indemnify Mr. Mills for this judgment and on August 2, 2021, Mr. Mills executed an "Assignment of Rights" stating that he "assigns any rights, claims or causes of action he has against his insurer, Liberty Mutual or any related insurer or company, agent or representative which might provide coverage or defense costs for the [underlying action].  Zachary Mills and his attorney will cooperate by providing reasonable information needed [for Mr. Footman] to pursue the assignment."  DSMF ¶ 52; PRDSMF ¶ 52; PSMF ¶¶ 31-32; DRPSMF ¶¶ 31-32.  In exchange, Mr. Footman agreed not to summon Mr. Mills to a disclosure hearing until the conclusion of this action.  DSMF ¶ 53; PRDSMF ¶ 53.

### C.    The Instant Action

Mr. Footman filed this action against Liberty in Oxford Superior Court on or about August 27, 2021, and Liberty removed it to this Court based on the diversity of the parties.  DSMF ¶ 54; PRDSMF ¶ 54.  Asserting the rights assigned to him by Mr. Mills, Mr. Footman brings nine counts premised on Liberty's purported failure to provide coverage and a defense.  DSMF ¶¶ 55-56; PRDSMF ¶¶ 55-56.

### D.    Where Zachary Mills Resided and When

Liberty's determination there was no duty to defend was based on its own investigation and comparison of the complaint in the underlying action to the Whittemore and Mason Policies.[15]  PSMF ¶ 41; DRPSMF ¶ 41.  Liberty concluded

---

[15]    Liberty qualifies PSMF ¶ 41 to add that it also compared the policies to the complaint in the underlying action.  DRPSMF ¶ 41.  The Court accepts that qualification.

that Mr. Mills was not a resident of the Whittemore or Mason households and therefore not covered by any policy Liberty issued. *Id.*

### 1. Mr. Mills' Listed Residences

In dealings with state agencies, financial institutions, and law enforcement, Mr. Mills has, in more than 30 instances from 2015-2019, listed his address as either the Whittemore Residence or the Mason Residence. DSMF ¶ 44; *id.,* Attach. 19, *Timeline of Zach Mills' Addresses*; PRDSMF ¶ 44. His driver's license, issued on May 2, 2014, lists the Whittemore Residence as his address, as do documents related to criminal proceedings in 2015 and 2016. DSMF ¶ 44; PRDSMF ¶ 44; PSMF ¶ 42; DRPSMF ¶ 42. A November 17, 2017, insurance declaration for the Masons' auto policy lists the Mason Residence. DSMF ¶ 44; PRDSMF ¶ 44; PSMF ¶ 37; DRPSMF ¶ 37. Mr. Mills' bank statements from mid-2017 to January 2018 list the Whittemore Residence. DSMF ¶ 44; PRDSMF ¶ 44. Documents related to criminal proceedings between March 2018 and early 2019 list a mixture of the Whittemore and Mason residences. *Id.* Finally, Mr. Mills purchased a hunting license on October 11, 2017, stating his address as the Mason Residence. PSMF ¶ 36; DRPSMF ¶ 36.

### 2. Statements During the Investigations

In a 2018 interview with a Liberty investigator, Mr. Mills stated that he had been living with his parents until roughly a year before the accident. PSMF ¶ 34; DRPSMF ¶ 34; DSMF ¶ 10; *id.,* Attach. 6, *Recorded Interview of Zachary Mills* at 3 (*Mills Interview*); PRDSMF ¶ 10. But when asked whether he had been living at his parents' home on the day of the accident he stated "[n]o, I was living with my

11

girlfriend at [the Bolduc Residence] in Oxford, Maine."[16]  *Mills Interview* at 3:53-56. Asked how long he had been living there prior to the shooting, he replied "I'd say about a year since I met Bailey [Bolduc]."  *Id.*  During that interview, on September 12, 2018, Mr. Mills told the investigator that his current address was the Whittemore Residence.  *Id.* at 2:17-19.

Mr. Mills' account of living at the Bolduc Residence at the time of the incident is supported by statements from Darcie Bolduc, his girlfriend's mother and the homeowner.  DSMF ¶ 42; PRDSMF ¶ 42.  Mr. Mills stated that he and Bailey Bolduc have a child together.[17]  *Mills Interview* at 5:167-168.  On the day of the accident, in an interview with a Warden from the Maine Warden Service, Ms. Bolduc was asked where Mr. Mills lives and responded that "he stays with me at my house."  DSMF ¶ 42; PRDSMF ¶ 42.

### 3.    The Whittemore and Mason Affidavits

There are also the accounts of Jennifer Whittemore and the Masons.  Ms. Whittemore provided an affidavit stating that: (1) she has lived at the Whittemore Residence since summer 2013; (2) Mr. Mills has never resided or lived with her since she moved there; (3) he has stayed overnight at the house fewer than five times, has never had a bedroom, and has never moved regularly-used possessions into the house;

---

[16]    Mr. Footman raises four objections to Liberty's paraphrasing of Mr. Mills' interview.  PRDSMF ¶ 10.  The Court resolves the disputes by quoting directly from the interview transcript, rather than parsing the paraphrasing.

[17]    Asked to describe his relationship with Mr. Footman, Mr. Mills stated "[h]e was, he's Bailey [Bolduc's], my, he's my baby mama's cousin. And I, I met him through my child's mother, and we have, we were close until this happened."  *Mills Interview* at 5:167-168.

and (4) aside from keeping him on her healthcare plan, she has not provided him any regular financial support since 2013.[18]  DSMF ¶¶ 24-30; PRDSMF ¶¶ 24-30.

Similarly, Charles Mason and Kathy Mason provided virtually identical affidavits averring that: (1) Mr. Mills never lived with them at the Mason Residence; (2) he never kept his belongings there or had a bedroom or keys; (3) from mid-2017 to mid-2018 they saw Mr. Mills fewer than five times; and (4) in early 2017 Charles Mason cosigned an auto loan for Mr. Mills and on November 17, 2017 added him to their auto insurance policy, but Mr. Mills was responsible for the payments and the Masons never provided him with any other, regular financial support.[19]  DSMF ¶¶ 31-41; PRDSMF ¶¶ 31-41.

### 4.   The Arbitrator's Findings

Finally, there are the findings of the arbitrator, who concluded that Mr. Mills "was an individual who resided in Oxford County in the State of Maine . . .. In a series of documents dealing with state agencies, financial institutions, law enforcement, and

---

[18]   Mr. Footman objects that Mr. Mills stated previously that he was living with his parents prior to meeting Ms. Bolduc and that he "testified at the arbitration hearing he used this residence for his mail and other business matters."  PRDSMF ¶¶ 26-29.  The Court reframed these proposed assertions to reflect that they are statements in Ms. Whittemore's affidavit rather than uncontroverted facts.

   Mr. Footman also objects to DSMF ¶ 30 that "Ms. Whittemore providing health insurance is a form of financial support and dependence of [Mr.] Mills by Ms. Whittemore."  PRDSMF ¶ 30.  The affidavit, however, states that aside from the healthcare plan, she has not provided financial support, and the Court overrules the objection as beyond the scope of the fact asserted.

[19]   Mr. Footman objects that Mr. Mills "testified his residence was his grandparent[s'] house."  PRDSMF ¶¶ 34, 38-39.  For the reasons stated in the previous footnote, the Court has reframed these proposed assertions to reflect that they are statements in the Masons' affidavits rather than uncontroverted facts.

   Mr. Footman also denies DSMF ¶ 40 on the grounds that the Masons added Mr. Mills to their automobile policy on November 17, 2017.  PRDSMF ¶ 40.  The Court observes that DSMF ¶ 40 already asserts that "[t]he Masons added Mills to their auto insurance policy" and adds the date but otherwise overrules the objection.

   Finally, Mr. Footman also objects to DSMF ¶ 41 because the Masons provided him with auto insurance.  PRDSMF ¶ 41.  The Court slightly altered DSMF ¶ 41 to clarify that it refers to support other than the auto insurance.

13

others, [Mills] stated that his residence was either his mother's house -- 253 Damon Road in Sumner -- or his grandparents' house at 16 Eddies Road in Greenwood.  Mr. Mills testified that around the time of the injury to Mr. Footman, he used those residences for his mail and other business matters, and that he would often be out of state for weeks at a time, working for Bancroft Contracting, staying at temporary lodging during the course of a work project."[20]  DSMF ¶ 50; PRDSMF ¶ 50.

## III.   THE PARTIES' POSITIONS

### A.   Liberty Insurance Corporation's Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, Liberty asks this Court to grant summary judgment in its favor and against James Footman on all counts pleaded against it in the Amended Complaint.  As a threshold matter, it argues that because Mr. Mills was not a resident of the Whittemore or Mason residences, he does not qualify as "insured" under those policies and Liberty is thus entitled to summary judgment on all counts.  *Def.'s Mot.* at 7.  Liberty then goes on to address each count individually, ultimately offering the same conclusion.

### 1.   Zachary Mills' Residence

Liberty begins by noting that "[t]he party seeking coverage under an insurance policy bears the initial burden of showing that the alleged injury for which it has been sued falls within the scope of the contract."  *Id.* at 4 (citations omitted).  The Policies

---

[20]   Mr. Footman's proposed PSMF ¶ 34, citing the arbitration decision, asserts that Mr. Mills testified that his residence was either the Mason Residence or the Whittemore Residence.  The record does not reveal support for that assertion and, moreover, because the Court admits the exact language of the arbitrator's decision it omits Mr. Footman's paraphrasing of that decision as redundant.

provide liability coverage for claims made or suits brought against an "insured," which is defined to include "you [the named insured] and residents of your household who are . . . your relatives." *Id.* It submits that Mr. Mills was not a resident of either the Whittemore or Mason households at the time of the incident and therefore is not an "insured" under either policy. *Id.* at 4-5.

Liberty observes that "[t]he gravamen of all of Footman's allegations in this action is that Mills was a resident of the Whittemore and/or Mason households at the time of the incident and therefore qualifies as an 'insured' under the Policies" but submits that "the evidence is to the contrary." *Id.* at 5. It offers that "Mills himself told Liberty that at the time of the incident, he lived at Darcie Bolduc's house . . . with his girlfriend, Bailey Bolduc, and their child" and asserts that this "is a clear expression of Mills' subjective intent—to reside with his girlfriend and their child at [the Bolduc Residence], not at the Whittemore household or the Mason household." *Id.* at 5-6. Liberty adds that at the time of the incident, "Darcie Bolduc told law enforcement that Mills lived at her house" and contends that he "was clearly a resident of the Bolduc household." *Id.* at 6.

Liberty also submits the Whittemore and Mason affidavits, offering these as "uncontroverted testimony" that Mr. Mills had virtually no connection to these residences around the time of the incident. *Id.* It also argues that "the documents Footman purports establish Mills' residence are largely remote in time," noting that the drivers license was issued more than three years before the incident and that none of the documents relating to criminal proceedings were from 2017. *Id.* Liberty

contends that these "[d]ocuments from years before and years after the incident shed no light on Mills' residency on the date of the incident." *Id.* at 6-7.  Moreover, it adds, "the documents . . . do not establish residence" because, in Liberty's view, "[t]hat Mills provided agencies and institutions with a particular address and the simple act of receiving mail at a particular address does not overcome" his own statements and the affidavits.  *Id.* at 7.  Liberty concludes that Mr. Mills was a resident of the Bolduc household and did not qualify as an "insured" under either policy, and therefore it is entitled to summary judgment because Mr. Footman "cannot meet his burden of showing that Mills' liability is within the scope of coverage provided by the Policies." *Id.*

### 2.   The Individual Counts

Count I alleges breach of contract, premised on Liberty's purported failure to indemnify and defend Mr. Mills.  *Id.* at 7.  Liberty submits that "Mills had no contract with Liberty, and Liberty had no obligation to defend or indemnify him under either the Whittemore Policy or the Mason Policy," and therefore the breach of contract count fails as a matter of law.  *Id.*

Count II alleges "unfair deceptive acts or practices" relating to Liberty's declination of coverage.  *Id.* at 10.  Liberty asserts that this claim must fail for three reasons: (1) Mr. Mills was not an insured and therefore not entitled to coverage; (2) even if he was an insured, he did not "purchase" either of the policies, which it contends is a required element of an unfair practices claim; and (3) Liberty, as an

authorized insurer, is not subject to the Maine Unfair Trade Practices Act (UTPA). *Id.* at 10-13.

Count III is brought in quantum meruit, alleging that Liberty materially breached its insurance contract with Mr. Mills and thereby received an unconscionable monetary benefit. *Id.* at 13. Liberty argues that this claim fails as a matter of law because "Mills never rendered any services to Liberty, let alone with its knowledge and consent, and there are no circumstances from which Mills could expect payment." *Id.* at 13-14.

Mr. Footman asserts Count IV for strict liability. Liberty counters that, in addition to Mr. Mills not being an insured, "strict liability is a tort theory" and "[a]ny liability must be based on actions independent of the alleged breach of contract," but Mr. Footman's complaint is "based solely on alleged breach of contract." *Id.* at 14-15. Because, in Liberty's view, "[t]he strict liability count simply reframes the breach of contract allegations, without any alleged independent tortious conduct," it is inadequate as a matter of law." *Id.* at 15.

Count V alleges negligence. Liberty again contends that tort recovery must be based on actions separable from breach of contract and submits that because Mr. Footman has not alleged any independent tortious conduct he cannot sustain a negligence claim. *Id.* at 14.

Count VI requests a declaratory judgment, which Liberty interprets to seek a declaration that Mr. Mills was an insured at the time of the incident. Liberty asserts

that it is entitled to summary judgment because Mr. Mills was not an insured, for the reasons previously described. *Id.* at 15-16.

Count VII alleges a violation of the Unfair Claims Settlement Practices Act (UCSPA). Liberty submits that this claim fails because Mr. Mills was not an insured and, moreover, because there he has not provide any evidence supporting his claim that Liberty knowingly misrepresented pertinent facts or policy provisions to Mr. Mills or otherwise violated the USCPA. *Id.* at 17.

Count VIII is for reach and apply. Liberty offers that reach and apply is available to a judgment creditor only where the judgment debtor is insured for the underlying judgment and, because Mr. Mills was not an insured, this count fails as a matter of law. *Id.* at 19.

Finally, Count IX seeks an award of punitive damages. Liberty contends that punitive damages are not available for breach of contract or simple negligence and that there is no evidence of tortious conduct that would support a punitive damages award. *Id.* at 20.

### B.   James Footman's Opposition

Mr. Footman similarly argues the issue of residency and then turns to the individual counts. He submits that "there are questions regarding the material facts submitted by Liberty as to whether or not Mills was a resident of either the Mason or Whittemore's household," sufficient to defeat summary judgment. *Pl.'s Opp'n* at 2-3. Mr. Footman recites the arbitrator's findings that Mr. Mills listed the Whittemore/Mason residences as his address in documents dealing with state

agencies and financial institutions and that Mr. Mills had testified that he "used those residences for his mail and other business matters, and that he would often be out of state for weeks at a time" for work.  *Id.* at 3.  He also offers that courts have generally found the term "resident" to be ambiguous and have interpreted the term liberally in favor of coverage.  *Id.* at 3-4 (collecting cases).

Mr. Footman goes on to submit that "Liberty was required to compare the allegations of the underlying complaint with the relevant provisions of the Policies to determine whether there is any legal or factual basis that could . . . result in an award of damages covered by the terms of the policy" and that Liberty's investigation and "resort to extrinsic evidence" were inappropriate.  *Id.* at 4.  He offers further that "Liberty was provided with a copy of the complaint, and was provided with numerous documents listing [Mills'] residence prior to and after the shooting, creating a duty for Liberty to provide a defense for Mills."  *Id.* at 5.

Mr. Footman similarly contends that "[t]he duty to indemnify requires a comparison of the policy with the facts established at trial to see if there is coverage" and—in its view—the arbitrator established "[t]he issue regarding Mills residency" in his favor and that the determination is binding on Liberty and created a duty to indemnify.  *Id.* at 5-6.  He submits that Liberty had an opportunity to defend its interests but declined and cannot now be permitted to relitigate the residency issue purportedly decided in the underlying action.  *Id.* at 6.

Moving onto the individual claims, Mr. Footman responds to Liberty's UTPA argument that its contention that "Mills did not make any purchase is unfounded"

because "[a]s an insured he has directly contracted with the insurance company." *Id.* at 7. Additionally, he asserts that Liberty is not exempt from the UPTA because its conduct was unlawful. *Id.*

Regarding the quantum meruit claim, Mr. Footman outlines the required elements and contends that "[w]hile the Maine Law Court has recognized that the existence of a contract precludes recovery on a theory of unjust enrichment . . . a party, nonetheless, is not precluded from pleading both theories because a factfinder may find that no contract exists and may still award damages on a theory of unjust enrichment." *Id.* at 8 (citation and internal quotations omitted).

In support of his negligence claim, Mr. Footman submits that "Liberty acted negligently when Liberty's attorney contacted the Arbitrator and had an ex parte communication with the Arbitrator regarding issues of Mills residency and about whether the Arbitrator's decision would be binding on Liberty" and therefore "Liberty by and through its attorney committed independently tortious conduct beyond the denial of the claim." *Id.*

Regarding strict liability, Mr. Footman asserts that contract law generally operates on a strict liability system and "Defendants have provided no factors that legally excuse Defendant's affirmative breach of the contract nor has Defendant shown that performance was impossible on account of a supervening event." *Id.*

Mr. Footman next argues that Liberty "is not entitled to summary judgment on [his] Declaratory Judgment Count and [he] is entitled to summary judgment with a declaration that Liberty breached its duty to defend and to indemnify Mills" because

"[t]he Arbitration Decision and Award does have res judicata effect, and Liberty may not now collaterally attack the facts presented at the arbitration hearing regarding residency." *Id.* at 9. He submits further that "[t]he issue of Mills' residency was addressed in the Arbitrator's Decision and Award," accepted by the state court, and "[t]o the extent Liberty asks the Court to review certain state court proceedings and to overrule or modify a final decision of the state court, the Court lacks jurisdiction to consider Liberty's arguments/defenses." *Id.* at 12.

In support of his UCSPA claim, Mr. Footman offers that "Liberty states their coverage position letters clearly stated the policy language, its understanding of the facts and the grounds for denial coverage" but "Liberty did not write a coverage position letter to Mills." *Id.* Moreover, he contends that Liberty asserts that its "good faith investigation" is a legitimate basis to contest liability but "Liberty should not have based its decision to deny defense coverage on the basis of an investigation." *Id.*

Regarding reach and apply, Mr. Footman submits that it is available to him as an insured under Liberty's policies. *Id.* at 12-13. Finally, he contends that his punitive damages claims is not based solely on breach of contract but also on Liberty's purported "attempt[] to affect the integrity of the [arbitration] process and the fairness of the result" through ex parte communications, which were "outrageous and malice towards Mills as a result of their conduct can be implied." *Id.* at 13.

## C.   Liberty Insurance Corporation's Reply

In reply, Liberty counters that: (1) Mr. Footman is improperly attempting to amend Count III from a quantum meruit claim to an unjust enrichment claim; (2) he

should not be permitted to advance a new theory of liability for negligence; (3) even if permitted, he still cannot establish the elements of a negligence claim; and (4) he has not offered sufficient evidence to support his punitive damages claim. *Def.'s Reply* at 1-6.

### D.    James Footman's Motion for Partial Summary Judgment

Mr. Footman asks the Court to "grant summary judgment on [his] Breach of Contract and Declaratory Judgment Counts and stop Liberty from asserting Mills was not an insured." *Pl.'s Mot.* at 1.  He argues that Liberty owed him a duty to defend and a duty to indemnify, breached both duties, and is bound by the arbitrator's factual findings. *Id.* at 1-10.

While Mr. Footman only seeks summary judgment on two counts of the amended complaint, the parties' arguments in their briefings on these issues largely mirror the arguments made for Liberty's motion.  Regarding the duty to defend, Mr. Footman again contends that "Liberty incorrectly made the decision not to defend Mills by conducting its own independent investigation and failing to just compare the complaint to the policy." *Id.* at 2.  He notes that the underlying complaint alleged that "Defendant Zachary Mills is an individual who resides at [the Whittemore Residence]." *Id.* at 3 (quoting *Underlying Compl.* ¶ 2).  Mr. Footman also offers that the Policies define insured to include residents of the insured household who are related to the policyholder. *Id.* at 4.  He concludes that "[c]omparing the complaint to the Liberty policy states facts which bring the claim of damage within the policy coverage" and triggers the duty to defend. *Id.*  Therefore, in his view, Liberty's refusal

to defend Mr. Mills is a "breach of the insurance contract" and the Court should award summary judgment on his breach of contract claim. *Id.* at 4-5.

Turning to the duty to indemnify, Mr. Footman submits that "Liberty is bound by the judgment as to any factual issues that might have been litigated in the underlying negligence action." *Id.* at 5. He recounts the evidence relating to Mr. Mills' residence and concludes that "[t]aking these facts in total, Mills is a resident of his mother's and grandparents households at the time of the shooting and thus covered under the policies issued by Liberty." *Id.* at 5-9.

Finally, Mr. Footman contends that the arbitrator resolved the issue of Mr. Mills' residence and concludes that "Liberty's election to not file a declaratory judgment action, failure to appeal the findings of the arbitrator, its decision not to participate in the arbitration hearing and its actual participation in the arbitration process precludes them from asserting Mills was not a resident household member who is afforded coverage under insurance policies issued by Liberty." *Id.* at 9-10.

### E.   Liberty Insurance Corporation's Response

In response, Liberty reiterates its position that Mr. Mills was not an "insured" under either policy. *Def.'s Opp'n* at 3. On this point, it largely replicates its arguments from its own motion. *See, e.g., id.* at 5 ("The gravamen of all of Footman's allegations in this action is that Mills was a resident of the Whittemore and/or Mason households at the time of the incident and therefore qualifies as an 'insured' under the Policies"); *Def.'s Mot.* at 5-6 (identical language for this sentence and several subsequent paragraphs).

Liberty goes on to assert that "comparison of the complaint in the underlying action to the Policies did not reveal a duty to defend" and the underlying complaint "did not contain any allegations regarding Mills' residency at the time of the incident nor did it contain any allegation of familial relation between Mills and the Whittemores or Mills and the Masons." *Id.* at 11.  Liberty then "undertook a good faith, thorough investigation which revealed that Mills was not a resident of the Whittemore or Mason households" and "did not qualify as an 'insured' under either of the Policies, and therefore, there was no breach of the duty to defend." *Id.*

Regarding Mr. Footman's indemnification argument, Liberty responds that "an insurer's duty to indemnify is limited to settlements and judgments which are actually covered by the policy" and "Footman cannot meet his burden of demonstrating the judgment in the underlying action is within the scope of the personal liability coverage provided" by the policies, because he is not an insured. *Id.* at 11-12.

Liberty also rejoins that it is not bound by the judgment in the underlying action.  *Id.* at 13.  It submits that an insurer who declines to participate in a tort action "is not estopped from asserting noncoverage as a defense in a subsequent action brought by the insured or the insured's assignee." *Id.* (quoting *Elliott v. Hanover Ins. Co.,* 711 A.2d 1310, 1313 (Me. 1998)).  Moreover, Liberty asserts that, even if were bound by the judgment in the underlying action, "it would be bound only as to facts essential to the underlying judgment." *Id.* at 14.  It contends that "[f]ar from being essential to the underlying judgment, Mills' residency was completely

irrelevant to the determination that Mills negligently discharged his firearm, causing Footman injury." *Id.* Finally, Liberty argues that "[c]ollateral estoppel applies only if, *inter alia*, the identical issue, *i.e.*, Mills' residency, was determined by a prior final judgment" but the arbitrator's judgment "did not determine whether Mills was a resident of the Whittemore household at the time of the incident. *Id.* at 15.

### F.   James Footman's Reply

In reply, Mr. Footman reiterates that: (1) Mr. Mills was insured under at least one of the Policies; (2) Liberty had a duty to defend him; (3) Liberty had a duty to indemnify the judgment against Mr. Mills; and (4) Liberty is bound by the judgment in the underlying action. *Pl.'s Reply* at 1-6.

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original)

(quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where, as here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of New Hampshire v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011). The presence of cross-motions for

summary judgment "does not alter or dilute" the summary judgment standard. *Id.* (citing *Kunelius v. Town of Stow*, 588 F.3d 1, 8 (1st Cir. 2009)).

The parties agree that Maine law applies in this case. *Def.'s Mot.* at 3*; Pl.'s Mot.* at 4. In Maine, the issue of whether an individual is a resident of a household is a question of fact, but where material facts are not in dispute, the issue becomes a question of law for the court. *See Foley v. Hanover Ins. Co.*, No. CV-98-337, 1999 Me. Super. LEXIS 235, at *3-4 (Aug. 20, 1999) (holding that the plaintiff was entitled to summary judgment as to whether she was a resident of her parents' household where the facts were not in dispute).

## V.  DISCUSSION

### A.  James Footman's Comparison Test and Collateral Estoppel Arguments

Before reaching the primary issue of Mr. Mills' residence, the Court addresses two arguments Mr. Footman has made regarding what evidence Liberty could have properly considered in its initial claim decision and whether the Court "lacks jurisdiction to consider Liberty's arguments/defenses." *Pl.'s Opp'n* at 11. The Court finds both arguments unavailing.

#### 1.  Pleading Comparison Test

When evaluating whether an insurer has a duty to provide a defense to its insured, Maine has adopted the so-called "pleading comparison test." *Penney v. Capitol City Transfer*, 1998 ME 44, ¶ 6, 707 A.2d 387, 389. "We determine the duty to defend by comparing the allegations in the underlying complaint with the provisions of the insurance policy." *Id.* 1998 ME 44, ¶ 4, 707 A.2d at 388 (quoting

*Vigna v. Allstate Ins. Co.*, 686 A.2d 598, 599 (Me. 1996)); *Mitchell v. Allstate Ins. Co.*, 2011 ME 133, ¶ 9, 36 A.3d 876, 879 ("To determine whether an insurer has a duty to defend, we compare the allegations of the underlying complaint with the coverage provided in the insurance policy").

"[A]n insurer must provide a defense if there is any potential that facts ultimately proved could result in coverage." *Id.* ¶ 10 (emphasis in original). Furthermore, "[a]ny ambiguity in the policy regarding the insurer's duty to defend is resolved against the insurer, . . . and policy exclusions are construed strictly against the insurer." *Id.* ¶ 11 (internal citations omitted). Evidence beyond the pleadings and the insurance contract—"extrinsic evidence"—is normally ignored in the analysis. *E.g., Penney*, 1998 ME 44, ¶¶ 4-5, 707 A.2d at 388-89; *OneBeacon Am. Ins. Co. v. Johnny's Selected Seeds, Inc.,* No. 1:12-cv-00375-JAW, 2014 U.S. Dist. LEXIS 53098, at *24-25 (D. Me. Apr. 17, 2014).

Mr. Footman asserts that "Liberty's resort to extrinsic evidence is foreclosed by Maine's well-settled rule that, for purposes of the duty to defend, the court's scrutiny is limited to a comparison of the complaint and the policy language." *Pl.'s Opp'n* at 4-5. That comparison, however, is not favorable to Mr. Footman. The Policies provide, in relevant part, that "'Insured' means [the policyholder(s)] and residents of your household who are . . . [y]our relatives." DSMF ¶ 5; PRDSMF ¶ 5. Yet the underlying complaint's only reference to Mr. Mills' residence or insurance coverage states that, on July 17, 2019—more than eighteen months after the incident—"Defendant Zachary Mills is an individual who resides at 253 Damon Road

28

in the Town of Sumner, County of Oxford and State of Maine." *Underlying Compl.* ¶ 2.

Liberty can fairly be held to know that 253 Damon Road was a residence owned by Jennifer Whittemore and that it had issued a homeowner's policy insuring that residence. Nevertheless, the underlying complaint did not contain enough information to trigger a defense under the Whittemore Policy and there was no reference at all to the Mason Residence. Notably, the underlying complaint did not allege that Mr. Mills resided at the Whittemore Residence at the time of the incident or that he was related to Ms. Whittemore, both prerequisites for coverage. The Law Court has emphasized that "the comparison test is limited to the language of the underlying complaint and the insurance policy" and "[j]ust as we cannot read extrinsic facts or allegations *into* an underlying complaint in the comparison test, we cannot selectively read facts or allegations *out of* that complaint in order to conclude that the insurer has a duty to defend." *Barnie's Bar & Grill, Inc. v. United States Liab. Ins. Co.*, 2016 ME 181, ¶ 9, 152 A.3d 613, 616–17 (Mar. 23, 2017) (emphasis in *Barnie's*). Even assuming the truth of every allegation in the underlying complaint, a comparison between the complaint and the policy would not lead to the conclusion that a person with the last name Mills, who was living in the Whittemore Residence in 2019, was living there on November 25, 2017, or that someone named Mills was a relative of Ms. Whittemore. In short, application of the pleadings comparison test would not trigger a defense under either the Whittemore or Mason policy.

### 2. Collateral Estoppel

Mr. Footman also contends that "[t]he Arbitration Decision and Award does have res judicata effect, and Liberty may not now collaterally attack the facts presented at the arbitration hearing regarding residency." *Pl.'s Opp'n* at 8-9. He submits further that "[t]he issue of Mills' residency was addressed in the Arbitrator's Decision and Award which was accepted and entered as an Order of the state court" and "[t]o the extent Liberty asks the Court to review certain state court proceedings and to overrule or modify a final decision of the state court, the Court lacks jurisdiction to consider Liberty's arguments/defenses." *Id.* at 12. Liberty objects that estoppel does not apply in these circumstances and that the arbitrator did not make any final judgment concerning Mr. Mills' residency. *Def.'s Opp'n* at 13-16.

The Court does not find it necessary to address the applicability of estoppel because the arbitrator's decision plainly did not "resolve" the issue of Mr. Mills' residency and neither party objects to his factual findings. The Arbitrator's Decision and Award states, in relevant part:

> The Arbitrator finds as follows:
>
> On November 25, 2017 Defendant Zachary Mills was an individual who resided in Oxford County in the State of Maine.
>
> In a series of documents dealing with state agencies, financial institutions, law enforcement, and others, he stated that his residence was either his mother's house -- 253 Damon Road in Sumner -- or his grandparents' house at 16 Eddies Road in Greenwood. Mr. Mills testified that around the time of the injury to Mr. Footman, he used those residences for his mail and other business matters, and that he would often be out of state for weeks at a time, working for Bancroft Contracting, staying at temporary lodging during the course of a work project.

PSMF, Attach. 1, *Arbitration Decision and Award* at 1 (*Arbitration Decision*).

The arbitrator's descriptions of what Mr. Mills stated to state agencies and others about his residence, whether he used the residences for mail, and whether he spent time for work away from his residence are effectively agreed to by the parties, so there is no need to apply collateral estoppel on these factual findings, since the parties to this case agree on these facts anyway.  DSMF ¶¶ 44, 50; PRDSMF ¶¶ 44, 50.  Moreover, the arbitrator never made any finding or drew any conclusions about insurance coverage.  *Arbitration Decision* at 1-3.

Finally, Maine "has adopted the view that an insurer who wrongfully refused to defend is in breach of contract and is subject to contractual remedies for the breach." *Bucci v. Essex Ins. Co.*, 393 F.3d 285, 294 (1st Cir. 2005) (citing *Elliott v. Hanover Ins. Co.*, 1998 ME 138, ¶ 11, 711 A.3d 1310)).  "[A]n insurer does not, by breaching the duty to defend, lose the right to assert noncoverage as a defense to a claim for indemnification brought by the insured." *Harlor v. Amica Mut. Ins. Co.*, 2016 ME 161, ¶ 24, 150 A.3d 793.  Rather, under Maine law, "[i]f the insurer can demonstrate that the liability of the insured is entirely uncovered by the insured's policy, the insurer is not liable for any obligations incurred by the insured in a settlement." *Id.*, ¶ 25.

In *Elliott*, the Maine Supreme Judicial Court expressly rejected the contention that concepts of estoppel bar an insurer which has denied coverage from later asserting a lack of coverage. *Elliott*, 1998 ME ¶ 11.  The *Elliott* Court wrote:

> [I]f an insurer who refuses to defend were estopped from asserting the lack of coverage as a defense in a subsequent action, then the insurer's duty to indemnify would be coextensive with its duty to defend.  We, however, have repeatedly stated that an insurer's duty to indemnify is

> independent from its duty to defend and that its duty to defend is
> broader than its duty to indemnify. An insurer that breaches its duty to
> defend therefore is not estopped from asserting noncoverage as a defense
> in a subsequent action brought by the insured or the insured's assignee.

*Id.* (citations omitted).

Consistent with Maine law and with the facts in this case, the Court rejects Mr. Footman's attempt to impose principles of collateral estoppel on the arbitrator's decision in this case.

### B.   **Zachary Mills' Residence at the Time of the Incident**

The Court turns to the fundamental question in this case: whether Mr. Mills was a "resident" of either the Whittemore or Mason households on November 25, 2017, the date of the accident. Mr. Footman's claims are all grounded on the premise that, as an insured, Mr. Mills was entitled to indemnification and defense by Liberty. Liberty does not dispute that, if Mr. Mills was a resident of one of those households, he would be insured and thereby entitled to indemnification and defense—which Liberty did not provide. Mr. Footman, however, does not dispute Liberty's contention that, if Mr. Mills was instead a resident of the Bolduc household on the day of the incident, there would be no coverage.

### 1.   **Maine Caselaw**

The Maine Supreme Judicial Court has provided guidance on this question in *Cambridge Mutual Fire Insurance Company v. Vallee*, 687 A.2d 956 (1996) and *Dechert v. Maine Insurance Guarantee Association*, 711 A.2d 1290 (1998). In *Vallee*, an insurance company filed a complaint seeking declaratory judgment that the defendant was not covered under his father's homeowner's insurance policy. 687 A.2d

at 956.  As in this case, the policy in *Vallee* defined "insured" to include relatives who were "residents" of the policyholder's household.  *Id.* at 957.  The defendant in *Vallee* had a home with his wife in Lisbon, Maine.  *Id.*  However, almost one month before the events leading to the insurance claim arose, the defendant was arrested and charged with assaulting his wife, and a condition of his bail prohibited him from returning to their home in Lisbon.  *Id.*  Consequently, for the month leading up to the events giving rise to the insurance claim, the defendant lived with his parents.  *Id.* He kept his clothes at his parents' home and returned there each day after work.  *Id.* He intended to live there until the assault charge was resolved.  *Id.*

In determining whether the defendant was a resident of his parents' household for purposes of the insurance contract, the Law Court first noted that the term "resident" is ambiguous.  *Id.*  The *Vallee* Court observed that "residence" has "different shades of meaning depending on the context in which it is used."  *Id.* (citing *Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430, 146 S.E.2d 410, 414 (1966) (the words "resident," "residing," and "residence" have no precise, fixed meaning applicable to all cases)).  The Law Court further noted that the homeowner's insurance policy provided no clarification about the meaning of the term.  *Id.*  The *Vallee* Court explained that "[i]t is well established that ambiguities in an insurance policy are resolved against the insurer, and that a liability insurance policy must be construed to resolve all ambiguities in favor of coverage."  *Id.*

Construing the term "resident" in favor of coverage, the Law Court concluded that the defendant was a resident of his parent's household for purposes of the

insurance contract.  *Id.*  The Court held that the "temporary nature" of the defendant's stay at his parents' home did not preclude residence, and that as a result of the bail condition, he intended to reside with his parents until the criminal charge against him was resolved.  *Id.*

The Maine Supreme Judicial Court addressed the meaning of "resident" of a household again in *Dechert*.  711 A.2d 1290.  In that case, the plaintiff's father obtained homeowner's insurance for the family's primary residence as well as a trailer home located a few miles away.  *Id.* at 1291.  Several months before the accident giving rise to the insurance claim, the plaintiff moved back into his parents' primary residence after separating from his wife.  *Id.*  After living with his parents for a few months, the plaintiff moved into the trailer home so that his two sons could live with him over the summer.  *Id.*  The plaintiff did not pay rent, but he was responsible for buying his own food and paying for utilities.  *Id.*  Although the plaintiff had a job, his parents helped him financially by occasionally paying for utilities and helping him purchase a car.  *Id.*

In deciding whether the plaintiff was a "resident" of his parents' household for purpose of insurance coverage, the Court again noted that the term "resident" was ambiguous.  *Id.* (citing *Workman v. Detroit Auto Inter-Ins. Exch.*, 404, Mich. 477, 274 N.W.2d 373, 379 (1979) ("resident of an insured's household" has no absolute meaning and may vary according to circumstances)).  The Law Court explained that "[b]ecause we find the words ambiguous in the circumstances of this case and because they are

words of inclusion of persons covered, we interpret the words liberally to the extent they can reasonably provide coverage . . .." *Id.*

The *Dechert* Court indicated that determining whether an individual is a "resident" of a household is "fact specific," and it cited decisions from other jurisdictions to highlight that the determination turns on the particularized circumstances of each case. *Id.* (citing *Brown v. Trahan*, 526 So.2d 1216 (La. Ct. App. 1988) (finding no residency); *Row v. United Servs. Auto Ass'n*, 474 So.2d 348 (Fla. Ct. App. 1985) (finding residency)). As a general matter, the Law Court explained that a temporary absence does not necessarily terminate the status of residency in a household and that "much will depend on the subjective or declared intent of the individual." *Id.* Before remanding the case for further factual inquiry, the Court identified a number of factors relevant in determining residence given the facts of the case:

> When, if ever, [the plaintiff] ceased to be a resident in the household depends on a factual determination influenced by such questions as: What was [the plaintiff's] subjective or declared intent when he moved to the trailer? What was the nature of his tenancy? What, if any, belongings did [the plaintiff] leave with his parents? What was [the plaintiff's] practice in regard to returning home? Did [the plaintiff] retain a key? What was the extent of [the plaintiff's] financial dependency on his parents?

*Id.* The Court clarified that "[n]o one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others." *Id.*

In sum, both *Vallee* and *Dechert* teach that the term "resident of [a] household," without more, is ambiguous in the context of insurance policies, and therefore, the term should be construed liberally in favor of coverage. *Vallee*, 687

A.2d at 957; *Dechert*, 711 A.2d at 1291; *see Me. Bonding & Cas. Co. v. Grant*, CV-98-106, 1999 Me. Super. LEXIS 170, at *3 (Me. Super. June 18, 1999). Moreover, *Dechert* instructs that determining whether an individual is a resident of a household is a "fact specific" inquiry that turns on the totality of circumstances in each case. 711 A.2d at 1291. *Vallee* demonstrates that even a temporary stay can be sufficient to establish residence in a household, 687 A.2d at 957, while *Dechert* establishes that temporary absences from the home do not terminate residence. *Dechert*, 711 A.2d at 1291. Both cases make clear that the subjective intent of the party seeking coverage is a primary factor in deciding residence. *Vallee*, 687 A.2d at 957; *Dechert*, 711 A.2d at 1291.

### 2.   Additional Factors in Determining Residence

Like Maine, other states also employ a "fact specific" analysis to determine whether an individual is a resident of a household. Although the cases from these jurisdictions are not binding on this Court, they highlight some additional factors to guide the Court's residency determination. In *LaPlante v. Peerless Ins. Co.*, No. 1:15-cv-00351-JAW, 2017 U.S. Dist. LEXIS 93623, (D. Me. June 19, 2017), this Court noted that such additional relevant factors include: (1) the individual's age and legal status (e.g., minor, emancipated minor, adult); (2) the individual's marital status; (3) the duration of the individual's physical presence in, or absence from, the parental home on the date of the incident giving rise to the insurance claim; (4) the reasons or circumstances explaining their presence or absence; (5) the subjective intent of the individual; (6) the existence of a second place of lodging; (7) the individual's use of the

parental home address on important personal documentation; (8) the individual's receipt of mail at the parental home; (9) the individual's retention of a bedroom at the parental home; (10) the individual's storage of personal belongings at the parental home; (11) the nature of the individual's continuing activities while in the parental home; (12) the frequency of the individual's overnight visits to the parental home; and (13) the extent of the individual's financial dependence on the parents. *Id*. at \*23 (citations omitted).

### 3.    Application

In considering Liberty's motion for summary judgment, the Court has viewed the facts of the case in the light most favorable to Mr. Footman consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002) (citing *C.K. Smith & Co. v. Motiva Enters.,* 269 F.3d 70, 72 (1st Cir. 2001)).   The Court, having applied these facts to the factors set forth above, and having construed the term "resident" liberally in favor of coverage, nevertheless concludes that Mr. Footman was not a resident of his mother's or grandparents' household at the time of the incident.

### a.    Zachary Mills' Subjective Intent

The Court begins with the key factor of Mr. Mills' subjective intent. *Vallee*, 687 A.2d at 957; *Dechert*, 711 A.2d at 1291.   Mr. Mills has not been deposed in this case, but the record includes a transcript of his statements to a Liberty investigator and the arbitrator's summary of his testimony at the arbitration hearing.   On

September 12, 2018, ten months after the incident, in an interview with Liberty's investigator, Mr. Mills stated about his residence:

> **Investigator:** And on that day [of the incident], were you living in your parents' home, or were you living elsewhere?
>
> **Mr. Mills:** No, I was living with my girlfriend at 302 Number Six Road, in Oxford, Maine [the Bolduc Residence].
>
> **Investigator:** . . . [a]nd how long have you been living there prior to the shooting?
>
> **Mr. Mills:** Um, I'd say about a year since I met Bailey [Bolduc.]
>
> **Investigator:** OK. And were you living with your parents before that?
>
> **Mr. Mills:** Yeah.

*Mills Interview* at 2:37-3:60.

The only other direct record evidence of Mr. Mills' intent is his testimony at the April 26, 2021 arbitration hearing. The arbitrator's decision notes that Mr. Mills listed his address as the Whittemore or Mason Residence in dealings with government and financial institutions and continues that "Mr. Mills testified that around the time of the injury to Mr. Footman, he used those residences for his mail and other business matters, and that he would often be out of state for weeks at a time, working for Bancroft Contracting, staying at temporary lodging during the course of a work project." *Arbitration Decision* at 1.

Although some of the facts may not be entirely consistent, the Court finds Mr. Mills' answers paint a clearer picture of his views and subjective intent regarding his residence at the time of the incident. During his interview on September 12, 2019, he stated that he lived with his parents before living with his girlfriend, but he was

38

not asked when he last lived with them.  Yet, asked whether he was living with his parents on the day of the incident, he replied unequivocally "No, I was living with my girlfriend at [the Bolduc Residence]" and had been living there "about a year."  *Id.* at 2:37-3:56.

Against Mr. Mills' clear statement of his residence, Mr. Footman points to Mr. Mills' testimony at the arbitration.  However, the Court also does not view Mr. Mills' arbitration testimony as conflicting with this interpretation.  When asked at the arbitration hearing about using the Whittemore/Mason Residences as his mailing address, Mr. Mills explained that "he used those residences for his mail and other business matters."  *Arbitration Decision* at 1.  Notably, he did not offer that he listed those addresses because he continued to live there, either full or part time, or was considering moving back, nor did he suggest that he still resided at the Whittemore or Mason households even if he was staying at Bolducs'.

The individual's use of the parental home address on important personal documentation and his receipt of mail at the parental home are generally factors that support continued residence when the individual is temporarily staying elsewhere. *LaPlante*, 2017 U.S. Dist. LEXIS 93623, at *23 (noting that the "receipt of mail" is one factor in establishing residency).  The underlying logic, however, is that the individual retains the parental address because he still considers it home—not a business office or P.O. box. *See Mendota Ins. Co. v. Gallegos*, 232 Ariz. 126, 131, 302 P.3d 651, 656 (Ct. App. 2013) (considering that the individual "received his mail at the [parental] home, not just for convenience purposes, but also because he considered

39

the [parental] home '[his] home'").  Yet it could be just as logical that a person would use his parents' or grandparents' address as his mailing address, not because he lived there, but because his life is in flux and the addresses of his parents and grandparents are more stable.  If the latter, the use of a parent's home address is more like the rental of a PO box or an address of convenience than evidence of residency at the address.

In this case, Mr. Mills had not explained why he used his parents' and his grandparents' mailing addresses and the Court views the mailing address factor to establish residency as tenuous at best.  The record reveals Mr. Mills' subjective intent to be unequivocal: as of November 25, 2017, he considered himself to have been living at the Bolduc Residence for roughly a year.

### b.    The Mason Residence

Turning first to the Mason Residence, the record reveals virtually no support for Mr. Footman's assertion that Mr. Mills was a resident of the Mason household at the time of the incident.  Kathy and Charles Mason have each sworn under oath that Mr. Mills never lived with them in their home or even stayed there regularly before the incident, never kept his belongings there, never had a bedroom or keys, and between mid-2017 and mid-2018, they saw him fewer than five times.  DSMF ¶¶ 31-41; PRDSMF ¶¶ 31-41.  This testimony is essentially uncontroverted.

Mr. Footman counters only that Mr. Mills testified at the arbitration hearing that "his residence was his grandparents' house," PRDSMF ¶¶ 34, 38-39, and that the Masons added him to their automobile policy.  The only foundation, however, for

this assertion about Mr. Mills' testimony is his arbitration testimony that he used the Mason and Whittemore residences for mail and other business matters; there is no suggestion that he ever testified to living or residing in the Mason Residence—at any point—or even to staying there occasionally.

It is true that Mr. Mills' grandparents had added him and his vehicle to their automobile policy shortly before the hunting incident.  PSMF, Attach. 20, *Mason Auto Declarations Page* at 1-6.  The record contains only the declarations page of the Liberty policy, not the policy itself, so there is no evidence based on the attached declaration page, that Mr. Mills was claiming his grandparents' residence as his own.[21]  The declaration page does not even clarify whether his grandparents were claiming him as a resident in their home.  DSMF ¶ 44 (citing Attach. 19, *Ex. Timeline & Docs.* at 15-20).  Without more information, this fact adds little to the analysis.  Similarly, as discussed earlier, evidence that Mr. Mills used his grandparents' address as a mailing address is equivocal as to residence.

Against this evidence are his grandparents' sworn statements that Mr. Mills never lived with them at 16 Eddie's Road, never kept his belongings there, never had

---

[21]  In DSMF ¶ 44, Liberty asserts in part: "The November 17, 2017 insurance declaration for the Masons' auto policy stated the Mason residence."  DSMF ¶ 44.  Mr. Footman admitted this assertion. PRDSMF ¶ 44.  This assertion is cryptic, and the Court is unclear what it means.  If it means that Mr. Mills' grandparents listed their residence as 16 Eddies Road, Greenwood, Maine, this fact is corroborated by the declaration page.  DSMF ¶ 44 (citing Attach. 19, *Ex. Timeline & Docs.* at 16).  If it means that Mr. Mills listed his address as 16 Eddies Road in Greenwood, this assertion is not corroborated by the declaration page.  Furthermore, Mr. and Ms. Mason stated in their affidavits that Mr. Mason had cosigned an automobile loan for Mr. Mills, that Mr. Mills was responsible for the loan payments, and that the reason they added him on their auto policy was "because of the loan."  DSMF Attachs. 16-17, *Affs. of Charles Mason & Kathy Mason*, ¶¶ 10.  Neither Mr. Mason nor Ms. Mason stated that the reason they put him on their auto insurance was that he lived with them and in fact, they both affirmatively said he did not.  *Id.*

a bedroom there, never had keys to their residence, and that from mid-2017 to mid-2018, they saw him fewer than five times.  DSMF Attachs. 16-17, *Aff. of Charles B. Mason, III* ¶¶ 3-9; *Aff. of Kathy Mason* ¶¶ 3-9.

No reasonable factfinder could conclude on this record that Mr. Mills was a resident of the Mason Residence at the time of the incident.

### c.     The Whittemore Residence

The Whittemore Residence presents a slightly closer call because—viewing all disputed facts in the light most favorable to Mr. Footman, as the Court must in evaluating Liberty's dispositive motion—the record suggests that Mr. Mills lived with his parents, perhaps but not likely at the Whittemore Residence, before and after living at the Bolduc Residence, and appears not to have changed his address on his drivers' license or with his banking institution.  However, a close examination of the timeline reveals no evidence upon which a reasonable juror could conclude that Mr. Mills resided at the Whittemore Residence at the time of the incident.

The timeline of Mr. Mills' addresses details thirty-six instances where he provided an address to a government or financial institution—listing the Whittemore Residence twenty-seven times[22] and the Mason Residence nine times—between October 2015 and March 2019.  *See Timeline of Zach Mills' Addresses;* PSMF ¶ 36; *id.*, Attach. 19, *Statement Regarding Hunting License.*[23]  According to Mr. Mills'

---

[22]     "Bank statements" is listed once for 2017, but the record includes multiple statements from the same bank.

[23]     In its references to the "timeline" of Mr. Mills' addresses, the Court combines the *Timeline of Zach Mills' Addresses* from Liberty's statement of material facts with the statement regarding the hunting license, which is not included in Liberty's compilation.

account, he lived with his parents, perhaps at the Whittemore Residence, moved to the Bolduc Residence in late 2016 or early 2017,[24] and moved back to the Whittemore Residence at some point between the incident and his September 12, 2018 interview with Liberty's investigator, where he listed his address as the Whittemore Residence but said he had not been living there at the time of the incident.  Of the thirty-six timeline address listings, seven are dated between October 8, 2015 and May 11, 2016, and twenty-five are dated between February 21, 2018 and March 26, 2019.  *Timeline of Zach Mills' Addresses.*

Between May 11, 2016 and February 21, 2018, however, the timeline includes only four instances of Mr. Mills' address being listed as the Whittemore or Mason Residences: (1) a hunting license obtained on October 11, 2017, listing the Mason Residence; (2) a November 17, 2017 car insurance declaration listing the Mason Residence; (3) a criminal background check conducted by the warden three days after the shooting, listing Mr. Mills' drivers' license address as the Whittemore Residence as of November 28, 2017; and (4) bank statements continually listing Mr. Mills' address as the Whittemore Residence.  *Id.* at 3-7, 17, 23.  Nothing in the record suggests that Mr. Mills' changed his drivers' license and/or banking address to the Whittemore Residence in 2017—rather, it indicates he did not change these addresses after moving into the Bolduc Residence.  The only "new" listings from this critical period are the hunting license and car insurance declaration, which offer his address as the Mason Residence.

---

[24]     Mr. Mills stated that, at the time of the November 25, 2017 incident, he had been living at the Bolduc Residence "about a year."  *Mills Interview* at 2:37-3:56.

In Ms. Whittemore's affidavit, she stated she has lived at 253 Damon Road, Sumner, Maine since the summer of 2013. DSMF, Attach. 15, *Aff. of Jennifer Whittemore* ¶ 3. Ms. Whittemore also stated that her son, Zachery Mills, had "never resided with me since I moved to 253 Damon Road in the summer 2013." *Id.* ¶ 3. Indeed, she stated that since the summer 2013, Mr. Mills "has stayed overnight at my house at 253 Damon Road fewer than five times" and he has "never lived with me." *Id.* ¶ 4. As of the date of the accident, Mr. Mills was twenty-one years old, one month shy of twenty-two. *See* PSMF, Attach. 23, *Portion of Warden's Report* at 1 (stating that Mr. Mills was born in December 1995); *Mills Interview* at 1:25-27. Ms. Whittemore's statement would be consistent with her move to a new home when Mr. Mills turned eighteen and with her statement that she retained "a few storage bins containing childhood items and memorabilia of Zachary and my other children in the basement of my house." *Id.* ¶ 5.

Against this detailed affidavit of Ms. Whittemore, there is the September 12, 2018 interview of Mr. Mills by an insurance adjuster concerning his living arrangements:

Q. And what's your address, Zachary?

A. 253 Damon Road in Sumner, Maine.

Q. And on that day, were you living in your parents' home or were you living elsewhere?

A. No, I was living with my girlfriend at 302 Number Six Road, in Oxford, Maine.

Q. And how long have you been living there prior to the shooting?

A. Um, I'd say about a year since I met Bailey.

Q. OK.  And you were living with your parents before that?

A. Yeah.

*Mills Interview* at 1-2.  In this interview, Mr. Mills did not state when he last lived with his parents, only that he lived with his parents "before that", and he was not asked whether he had lived with his parents at 253 Damon Road.

Although there appears to be a surface tension between Ms. Whittemore's affidavit in which she said he had never lived with her at 253 Damon Road before the November 25, 2017 incident and Mr. Mills' statement that he lived with his parents before moving into the Bolduc Residence, the Court's view is that his and his mother's recollections are reconcilable by fixing the date that he stopped living with his parents as just before she moved to Damon Road, around the time he turned eighteen.  This conclusion is consistent with Ms. Whittemore's sworn affidavit that Mr. Mills never lived at Damon Road and with his statement that he had lived with his parents sometime before he moved in with his girlfriend in 2016.

These nuanced factual differences do not matter.  The greater point is that whether Mr. Mills moved out of his parents' home, as his mother may recall, in 2013, or, as he may recall, in 2016, he had been living with his girlfriend and their son at his girlfriend's home and not at his parents' home on Damon Road for about a year before the November 25, 2017 accident.  Thus, the conclusion is thus compelled that as of November 25, 2017, he was a resident of the Bolduc Residence, not the Whittemore or Mason residence, and because he was not a resident of either the

Whittemore or Mason residences, he cannot be deemed an insured under their homeowners' policies.

Resolving all disputed facts in Mr. Footman's favor, the undisputed record reveals the following. Mr. Mills lived with his parents at some point prior to the incident, but Ms. Whittemore avers that he did not live with her at any time after she purchased the Damon Road house in 2013, when Mr. Mills was eighteen years old. He never resided at the Mason Residence.

At some point "about a year" before the incident Mr. Mills moved in with his girlfriend Bailey Bolduc at the Bolduc Residence. Mr. Mills and Ms. Bolduc have a child together. Between Mr. Mills moving in and the incident, he subjectively considered himself to be living at the Bolduc Residence and not at either the Whittemore or Mason Residence. No evidence in the record suggests that at this time he harbored any intent or plan to move to the Whittemore Residence. During this period, he continued to use the Whittemore Residence as his address on his drivers' license and with his bank but, when asked to provide his address in fall 2017 for a car insurance declaration and hunting license, listed the Mason Residence. He explained the situation as that he was using these residences for mail and other business purposes. Finally, at some point between the incident and September 2018, Mr. Mills moved to the Whittemore Residence. The parties do not offer a date or reason for Mr. Mills' move from the Bolduc Residence to the Whittemore Residence, however, the record supplied by the parties (but not cited by them) confirms that Mr. Mills was charged on February 21, 2018 with domestic violence assault against Bailey

Bolduc and prohibited from contacting her, which provides a separate explanation for why he moved to the Whittemore Residence in 2018 and why he would list somewhere other than the Bolduc Residence as his mailing address after the no-contact order had issued.[25]

Based on this record, no reasonable factfinder could conclude that Mr. Mills resided at the Whittemore Residence at the time of the shooting. The facts of this case are very different from *Dechert* and *Vallee*. In *Dechert*, the individual had "moved back into his parents' home" after separating from his wife and then, after a few months, moved into his father's trailer home, where he did not pay rent and his parents paid his utilities and helped him buy a car. 711 A.2d at 1291. Additionally, the interval was short, where there was "no question [the individual] was a resident in his parents' household in the spring of 1984" and then the incident occurred in August 1984. *Id.* at 1292. Here, by contrast, Mr. Mills had been fully moved out for a year—at the very least—living with his girlfriend and (presumably) their child, and

---

[25]     Although not mentioned by the parties, the fact that Mr. Mills moved to the Whittemore Residence sometime after November 25, 2017 is no evidence that he was not a resident at the Bolduc Residence on November 25, 2017. This is because the documents attached to Liberty's motion confirm that on February 21, 2018, he was charged by uniform summons and complaint with committing a domestic violence assault against Bailey Bolduc and on that date, he was prohibited from having any direct or indirect contact with Ms. Bolduc. *See* DSMF, Attach. 19, *Ex. Timeline & Docs.* at 31, 35. On March 1, 2018, a criminal complaint was filed against Mr. Mills, charging him with domestic violence assault against Ms. Bolduc and criminal mischief against her car window. *Id.* at 32. He was summoned to a hearing on these charges for June 20, 2018, later changed to July 27, 2018. *Id.* at 37, 39, *Notice of Hr'g.* The parties have not supplied any information about the final disposition of the domestic violence assault and criminal mischief charges against Mr. Mills in which Ms. Bolduc was the victim, but it seems compelled by the available documents that he was judicially ordered not to have contact with Ms. Bolduc as of February 21, 2018. His use of his mother's residence address from the February 21, 2018 date of the domestic violence and criminal complaint onward would be consistent with these criminal charges and his judicially-mandated departure from the Bolduc Residence. Thus, the fact he did not use the Bolduc address as his residence after February 21, 2018 is unremarkable and not probative of whether he resided there on November 25, 2017.

there is no evidence suggesting he maintained ties to the Whittemore Residence or was supported financially by Ms. Whittemore, except for remaining on her health insurance plan. Moreover, where the Law Court in *Dechert* did not find evidence of the individual's subjective intent, Mr. Mills stated clearly that he was living with Ms. Bolduc and explicitly not with his parents at the time of the incident.

Similarly, in *Vallee*, the Law Court focused on the individual's intent, finding that the individual had established residence at his parents' home in less than a month in large part because "[he] intended to reside with his parents" for the foreseeable future. 687 A.2d at 957. Again, Mr. Mills clearly expressed that he considered himself to be living at the Bolduc Residence at the time of the incident and nothing in the record suggests that—at the time—he intended to move back to the Whittemore Residence. *See Laplante*, 2017 U.S. Dist. LEXIS 93623, at *26 (rejecting the individual's argument that the fact she returned to her parents' home six months after the incident was proof of intent at the time, stating "even assuming that Ms. LaPlante intended to return to Maine after the winter, there is no evidence that she intended to return to her parents' home and no evidence that, if she returned to Maine, she intended to become a member of her parents' household").

In sum, Mr. Mills' subjective intent is clear, as of November 25, 2017, he lived with Ms. Bolduc—with whom he had a child—and had done so for roughly a year leading up to the incident, he explained his continued use of the Mason/Whittemore addresses as for mail and other business matters (only using the Mason address, where he never lived, for new documentation), and there is no other evidence in the

record suggesting that he maintained a presence in or desire to return to the Whittemore Residence until after the incident on November 25, 2017, when he left the Bolduc Residence because he was ordered to do so by a court. No reasonable factfinder could find residence at either the Whittemore Residence or the Mason Residence on this record. Liberty thus did not owe Mr. Mills a duty to defend or indemnify and, as Mr. Footman has not advanced a claim that can survive absent those duties, the Court must award summary judgment in favor of Liberty Insurance Corporation and against James Footman on all counts in the amended complaint.

## VI.    CONCLUSION

The Court GRANTS Liberty Insurance Corporation's Motion for Summary Judgment (ECF No. 19) and DENIES James Footman's Motion for Summary Judgment (ECF No. 21).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of March, 2023